**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **IMAX CORPORATION,** **Petitioner,** **vs.** **GIENCOURT INVESTMENTS, S.A.,** **Respondent.** | Civil Action No: ________________ **PETITION TO VACATE ARBITRATION AWARDS** |

Petitioner IMAX Corporation ("IMAX") by its attorneys, Kelley Drye & Warren LLP and Berger Singerman LLP, files this Petition to Vacate Arbitration Awards and accompanying Memorandum of Law in Support of Motion to Vacate Arbitration Awards and Declaration of Jonathan K. Cooperman dated October 17, 2017 (the "Cooperman Decl."). IMAX requests that the Court conduct a hearing concerning the same, and alleges as follows:

## NATURE OF THE ACTION

1. This action is brought to vacate a Partial Final Award dated February 7, 2017 (the "Partial Final Award") and a Final Award dated July 21, 2017 (the "Final Award", and together with the Partial Final Award, the "Awards"), issued in an arbitration captioned *Giencourt Investments S.A. v. IMAX Corporation*, Case No. 50-20-1300-1074 before the International Center for Dispute Resolution (the "Arbitration") held in Miami, Florida. (Cooperman Decl., Exs. B and C).

2. IMAX seeks vacatur of the Awards pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-208, (the "New York Convention"), as implemented by the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. (the "FAA").

3. The Arbitration concerned claims for breaches of a 2013 Master Agreement between Giencourt and IMAX governing Giencourt's right to sell IMAX® theatres to exhibitors in Latin America. Since 2005, the parties entered into a series of complex commercial agreements governing the parties' rights and obligations, as well as numerous trilateral individual theatre agreements each time a theatre was sold to an exhibitor. The 2013 Master Agreement contained a dispute resolution clause requiring arbitration of "any dispute under this Agreement not settled by negotiations between the parties".

4. Prior to the scheduled merits hearing in December 2015, the parties engaged in settlement negotiations in an attempt to settle both the Arbitration and disputes arising under five separate theatre agreements which were not subject to arbitration. On the eve of the merits hearing, Giencourt moved the Tribunal to declare that a series of short emails exchanged during these settlement negotiations resulted in an agreement to settle the Arbitration. IMAX argued that the Tribunal had no jurisdiction to entertain this motion and that the emails were, at best, an unenforceable skeletal framework of settlement negotiations for a future to-be-negotiated agreement. Over IMAX's objection, the Tribunal took evidence and testimony and determined that two short emails, augmented by one phone call, constituted a binding agreement that both terminated the Arbitration and created new obligations for IMAX.

5. The Partial Final Award and Final Award should be vacated for the following reasons:

A. *The Tribunal exceeded the limits of its jurisdiction.* ICDR Rule 29(1) relied upon by the Tribunal provides that "[i]f the parties settle the dispute before an award is made, the tribunal shall terminate the arbitration and, if requested by all parties, may record the settlement in the form of an award on agreed terms". This Rule involves consensual settlements and did not

give the Tribunal jurisdiction to determine a disputed settlement. Moreover, the Rule requires a Tribunal to terminate the arbitration upon a settlement, not to continue the proceedings and issue a subsequent Final Award providing attorney's fees to Giencourt as the Tribunal did here.

B. *The Tribunal further exceeded the limits of its jurisdiction to decide "disputes* *<u>under</u> [the 2013 Master] Agreement"*. (Emphasis added). The Tribunal did not have jurisdiction to determine whether a separate series of emails, that did not contain an arbitration provision, constituted a binding settlement, especially when (i) those emails also concerned five independent theatre agreements which provided that all disputes were subject to litigation before Courts in Ontario, Canada and (ii) where there was in fact ongoing Canadian litigation involving those agreements. Moreover, the Tribunal had no jurisdiction to decide whether issues concerning the alleged settlement agreement were arbitrable, a threshold determination that was for a Court to decide.

C. *The Partial Final Award and Final Award violate long-standing public policy preventing the use of settlement communications to demonstrate liability*. The series of emails reviewed and relied upon by the Tribunal involved negotiations to attempt to reach a global resolution of all issues between the parties. In addition to many of the emails having phrases such as "For Settlement Purposes Only" or "this communication is intended for settlement purposes only [and it] is not to be used by the parties in this or any other proceeding absent court order to the contrary," the context of the two emails that the Tribunal found constituted a settlement agreement were clearly written in connection with on-going settlement negotiations. Violating established public policy, the Tribunal nevertheless used these settlement negotiations to: (i) hold that the Arbitration claims had been settled; (ii) hold that disputes outside of the Arbitration were settled as described above in (B); and (iii) impose additional liability on IMAX

beyond the scope of the 2013 Master Agreement. These emails could never be used to establish liability under F.R.E. Rule 408, which embodies long-standing United States policy encouraging settlement discussions without fear they will be used against the parties. They likewise should not have been used against IMAX in the Arbitration.

D. *The Partial Final Award should be vacated because it is not sufficiently "final and definite."* Giencourt and IMAX had a ten year history of memorializing their agreements only through extensive, heavily negotiated, commercially definite, written and signed agreements covering all material aspects of their deal. The two short emails, constituting a mere three pages, was a skeletal outline of such a future to-be-negotiated written agreement. Material terms are never even addressed in these emails, including, for example, the timing of multi-million dollar payments. Indeed, Giencourt's email allegedly accepting the IMAX offer states that Giencourt still needed to "discuss the logistics of implementing these settlement terms." Yet Giencourt then made a motion to have the Tribunal determine those missing terms. The Tribunal declined to do so in the Final Award, stating that these additional terms could be supplied by a Court. However, a Court does not have the power under the New York Convention or FAA to add substantive terms to an arbitration award. The fact that both Giencourt and the Tribunal have acknowledged that the Awards are missing material terms demonstrate that the Awards are not final and definite and they should be vacated for that reason alone.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case presents claims arising under the New York Convention, 9 U.S.C. §§ 201-208. The Court has personal jurisdiction over Respondent pursuant to Fl. Stat. § 684.0049.

7. Venue is proper in this Court pursuant to 9 U.S.C. § 9 and 9 U.S.C. § 204 because the parties agreed to arbitrate in Miami, Florida, and the arbitration was held at 2 S. Biscayne Boulevard, Miami, Florida.

## THE PARTIES

8. Petitioner IMAX Corporation is a corporation organized under the laws of Canada, with its registered address at 2525 Speakman Drive, Sheridan Park, Mississauga, Ontario, Canada, L5K 1B I. IMAX has corporate offices at 902 Broadway in New York, New York.

9. Respondent Giencourt Investments S.A. is a corporation organized under the laws of the Republic of Panama. Giencourt maintains an office at Av. Presidente Kennedy 5146, Piso 2, Santiago, Chile, where Giencourt's sole principal, CEO, and President, Miguel Sfeir, resides. Giencourt also designated that address for any notice or communication in connection with the parties' 2013 Master Agreement (as defined below).

## THE UNDERLYING DISPUTE

### The IMAX® Business

10. IMAX is an innovator in entertainment technology, combining proprietary software, architecture, and equipment to deliver an immersive cinema experience, trademarked as the IMAX Experience®. More than 1,250 theatres in 75 countries worldwide use IMAX® equipment to exhibit large format motion pictures. IMAX's state-of-the-art camera, projection, screen, and sound technologies provide an all-encompassing entertainment experience that is more intense and exciting than in a traditional cinema.

11. The term "large format films" originally referred to the fact that the size of the film used to shoot and play IMAX® movies was ten times larger than the 35mm film used in

traditional movie theatres. IMAX's own large format films used a patented method that gives its films unsurpassed clarity. More recently, IMAX® movies have used digital technology, instead of traditional film, but IMAX® movies continue to be filmed in a larger and more immersive medium than traditional films.

12. IMAX® theatres were originally located primarily in cultural and educational institutions, such as museums, planetariums, and aquariums. Films shown in these theatres were at first oriented towards the types of documentaries typically shown in such institutions. In recent years, IMAX has expanded its worldwide brand well beyond cultural institutions. Hundreds of IMAX® theatres are now owned and operated by commercial theatre operators or "exhibitors".

13. IMAX has also developed a special digital remastering process that allows IMAX to digitally convert movies filmed in traditional 35mm or digital format to a format that can be played on large screens in IMAX® theatres. This allows IMAX® theatres throughout the world to exhibit the latest Hollywood blockbuster movies.

14. In addition to selling or leasing its proprietary entertainment systems, IMAX also earns money through related services operating IMAX® theatres, such as providing maintenance for its equipment and through ticket sales. IMAX also often acts as a film distributor.

**IMAX's History of Agreements with**
**Giencourt and Giencourt's Failure to Perform**

15. Giencourt is a company controlled by Miguel Sfeir, a wealthy citizen of Chile. Mr. Sfeir has had companies involved in diverse businesses in Latin America.

16. To sell or lease theatres to exhibitors, IMAX often uses its internal sales force. IMAX also sometimes uses outside sales representatives who may have relevant local

knowledge. Since 2005, IMAX has given Giencourt certain rights pursuant to four separate agreements to sell IMAX® systems, with the requirement that those systems be sold to exhibitors and theatres and be opened to the public in set time frames.

17. A December 15, 2005 Master Agreement (the "2005 Agreement") required Giencourt to purchase a total of three IMAX® theatre systems to be opened in Chile and Venezuela. Twelve years after the 2005 Agreement, and long after the last of these three theatres were required to be opened, Giencourt has not opened any of those theatres.

18. A subsequent March 1, 2008 Master Agreement (the "2008 Master Agreement") required Giencourt to sign and open 35 IMAX® theatres in South America, Central America, and the Caribbean within a specified periods of time from 2009 through 2014. The 2008 Master Agreement provided Giencourt with exclusivity to sell so long as the required number of theatres were signed and opened.

19. Giencourt did not meet its signing and opening requirements under the 2008 Master Agreement. For example, as of late 2011 Giencourt had opened only 2 of the required 11 theatres. While IMAX could have terminated the 2008 Master Agreement, resulting in Giencourt being contractually liable for nearly $34 million, IMAX instead chose to renegotiate the relationship. This resulted in the January 1, 2012 Master Agreement (the "2012 Master Agreement") which revised the dates for Giencourt to sell and open IMAX® theaters. In exchange, Giencourt's exclusive right to sell was limited to allow IMAX to make certain types of direct sales.

20. Giencourt failed to meet the required number of theatre signings and openings under the 2012 Master Agreement. IMAX again had the right to terminate the agreement and accelerate millions of dollars of unpaid amounts due from Giencourt. Instead, IMAX chose to

negotiate a revised Master Agreement in return for a number of concessions, foremost being that Giencourt agreed to surrender more of its exclusive right to sell.

**The 2013 Master Agreement**

21. In February 2013, Giencourt and IMAX entered into an "Amended and Restated" Master Agreement (the "2013 Master Agreement"). This 2013 Master Agreement covered the same 35 total systems originally contracted for in the 2008 Master Agreement, plus the three systems from the 2005 Agreement that still had not opened, for a total of 38 systems.[1]

22. The 2013 Master Agreement further limited Giencourt's exclusive right to sell and Giencourt made major concessions as IMAX was given the "unfettered right" to make direct sales: (i) to multi-theatre clients throughout Latin America (the type of exhibitors that comprise 90% of IMAX worldwide sales) and (ii) to any exhibitor within the entire countries of Brazil, Colombia and Ecuador.[2]

23. IMAX and Giencourt also agreed on a new and revised Development Plan which extended Giencourt's deadlines to sell and open theatres. Once again, Giencourt failed to open sufficient theatres to meet the required number. And although Giencourt's sales of theatres (combined with IMAX's own sales) met the required sales number, Giencourt later defaulted on five of its independent theatre agreements by failing to make required payments and actually open theatres at those five sites.

**The Independent Theatre Agreements**

24. The 2013 Master Agreement provided that each time a theatre system was sold to an exhibitor, two additional agreement were required: (i) an independent Theatre Agreement

[1] Cooperman Decl., Ex. A, 2013 Master Agreement, § 3.05.

[2] Cooperman Decl., Ex. A, 2013 Master Agreement, § 3.07(b).

between IMAX and Giencourt for the purchase, sale, and maintenance of the theatre; and (ii) a trilateral agreement among IMAX, Giencourt, and the exhibitor. The form Theatre Agreement was itself a complex 30-page agreement with several schedules. That independent Agreement provided an Opening Date by which the theatre must be opened to the public. The failure of a theatre to timely open was an event of default.

25. Giencourt sold five different theatres to exhibitors in Puerto Rico, the Dominican Republic, Panama, the Bahamas and Argentina.[3] None of those theaters ever opened. As a result of the failure to open these theatres, Giencourt is in default of the five independent Theatre Agreements.

26. Each of those five independent Theatre Agreements provided that the exclusive jurisdiction to resolve disputes was the Superior Court of Ontario, Canada. None of those independent agreements provided for disputes to be arbitrated. That was a clear negotiated difference from the 2013 Master Agreement.

**<u>The Issues in Dispute in the Arbitration</u>**

27. In addition to failing to meet its targets and defaulting on five individual theatre agreements, Giencourt also attempted to prevent IMAX from directly selling theatres. On several occasions where Giencourt knew that IMAX was close to reaching a direct deal with an exhibitor, whether a multi-theater client or in a permitted territory, Giencourt sent IMAX incomplete theatre agreements on a "take-it-or-leave-it" basis, knowing full well that IMAX could not approve those deals. When IMAX rejected those deals, Giencourt commenced the Arbitration asserting that IMAX breached the 2013 Master Agreement by blocking Giencourt from consummating theatre sales.

[3] Cooperman Decl, Ex. F.

28. In fact, purported Giencourt deals were all deficient. For example, some lacked the required due diligence to demonstrate that the proposed exhibitor was financially viable, others lacked a suitable location for a theatre and another involved the sale of a type of IMAX® system that Giencourt was not permitted to sell.

29. IMAX opposed Giencourt's claims and interposed counterclaims for Giencourt's own breach of the parties' agreements by its failure to sell and open theatres. Indeed, Giencourt's failure to open theatres has resulted in substantial losses to IMAX, which obtains revenues through the sale of its systems, as well as ongoing profit streams at operating IMAX® theatres from maintenance contracts, film licenses, ticket sales and the like. By the time of the arbitration hearing, IMAX had lost more than US$20 million in profits as a result of Giencourt's failure to perform.

**The Arbitration Proceedings and The Alleged Agreement to Settle The Arbitration Based on E-Mails Exchanged During Settlement Negotiations**

30. Section 18.12 of the 2013 Master Agreement provides as follows:

> This Agreement shall be construed according to the laws of the Province of Ontario, Canada, and the parties agree that the provisions of the United Nations Convention on the International Sale of Goods (also known as the "Vienna Sales Convention") shall not apply to the subject matter of this Agreement. Any dispute under this Agreement not settled by negotiations between the parties shall be submitted to final and binding arbitration pursuant to the rules of the Arbitration Association of America ("AAA'). Such arbitration proceedings shall be before three (3) arbitrators appointed by the AAA, in proceedings in Miami, Florida to be conducted in the English language.[4]

31. On November 22, 2013, Giencourt filed its Demand for Arbitration. By letter dated November 26, 2013, the ICDR notified the parties that the case was being administered

[4] Cooperman Decl., Ex. A (emphasis added).

under the International Dispute Resolution Procedures as amended and in effect as of June 1, 2009 (the "ICDR Rules"), unless the parties agreed otherwise.[5] During a conference call with the ICDR on December 3, 2013, the parties confirmed that the ICDR Rules would apply to the case.[6] The Members of the Tribunal were Professor Franco Ferrari, John E. O'Neill, Esq., and Klaus Reichert, SC who served as the Chairman of the Tribunal.

32. After initial briefing and written witness statements, evidentiary hearings were scheduled to take place in Miami, Florida from December 14 through December 18, 2015. On December 10, 2015, just days before the hearing, Giencourt claimed there had been a settlement between the parties, and made an application to the Tribunal to enforce a purported settlement agreement.[7]

33. The agreement was allegedly comprised of several emails exchanged between the parties during settlement discussions. These discussions dated back to the spring of 2015 between Giencourt's Miguel Sfeir and IMAX. The emails and their context demonstrate that they were part of a settlement process:

- In an email dated March 23, 2015, Mr. Sfeir wrote "PRIVILEGE SETTLEMENT COMMUNICATION" and included the following language in the first paragraph: "Please note that this communication and any meeting with you concerning settlement of the referenced action, is to be considered a privileged and confidential settlement negotiation that is not to be published by the parties or their representatives to that arbitration to any non-party, absent a court order or other judicial authority to the contrary."

5 The ICDR Rules are available online at: https://www.adr.org/sites/default/files/International%20Dispute%20Resolution%20Procedures%20%28Including%20Mediation%20and%20Arbitration%20Rules%29%20-%20English%20Jun%2001%2C%202010.pdf

6 Cooperman Decl., Ex. D.

7 *See* Cooperman Decl., Ex. G.

- Giencourt's principal Miguel Sfeir captioned his December 5, 2015 email to IMAX executive Mark Welton as "For Settlement Purposes Only" and wrote that "This communication is intended for settlement purposes only. It is not to be used by the parties in this or any other proceeding absent a court order to the contrary". Mr. Sfeir testified that this was his mindset both in the spring of 2015 and during his communications with IMAX into December 2015.

- After some initial settlement discussions in the spring of 2015, Mr. Welton reached out to Giencourt's Mr. Sfeir and had dinner with him near Mr. Sfeir's Arizona home in September 2015. After that dinner, on October 26, 2015 Mr. Welton sent Mr. Sfeir an email labeled "For Settlement Discussions Only" in which he provided a framework for a potential global resolution of all issues between the parties. Mr. Welton's email listed four different "buckets" of issues.

  These buckets of issues included resolving the "Terminated Deals" which were not part of the arbitration given that they involved breaches of the independent theatre agreements where disputes were subject to litigation in Ontario, Canada courts. Another bucket involved "Giencourt Deals Signed and Opened" which involved another 13 independent theater agreements with an Ontario, Canada court dispute resolution clause. The email also contained a section titled "Future Benefits for Giencourt" which listed matters relating to the independent Theatre Agreements and other matters not subject to the 2013 Master Agreement.

- Mr. Welton followed up his October 26th email with another email on November 19, 2015. This November 19th email stated that it was a follow-up to his earlier "For Settlement Only" email, writing that "As per my earlier email, I wanted to clarify my Future Benefits Bucket with you" and further discussed issues related to his October 26th email.

- Mr. Welton's next email dated November 24, 2015 continued to discuss the various "buckets" of his prior settlement framework. While that email itself is not labeled "For Settlement Purposes Only", Mr. Sfeir's next responsive email dated December 5, 2015 was captioned "For Settlement Purposes Only" and stated that "[t]his communication is intended for settlement purposes only. It is not to be used by the parties in this or any other proceeding absent court order to the contrary".

  The three sections of Mr. Sfier's e-mail were captioned "I. The Elements of the First Settlement Offer", "II. The elements of the Current Settlement Offer" and "III. Potential For Settlement Today", with the concluding paragraph stating "Please provide me with a date and time to discuss these issues, as the final

hearing quickly approaches and it is unlikely that additional settlement discussions will be possible."[8]

- Mr. Welton's December 7, 2015 email confirmed that all of his prior correspondence, including his November 24 email, were for settlement purposes. Mr. Welton wrote in part that,

> I hope your travel plans have been good. As we discussed, it was both of our intentions to try and settle a deal that was fair to both parties.
>
> * * *
>
> We feel that the last offer provided is very fair and generous….Without a settlement we will keep deposits….If I don't hear from you, I will understand that both parties will need to push ahead to the arbitration hearing and I will see you next week in Miami. At the very least we have tried our best to work towards a settlement and I appreciate your efforts. (*Id.*)

- The next day on December 8, 2015, Mr. Sfeir wrote a letter to Mr. Welton stating Giencourt's "acceptance of the terms of your offer of settlement of the current arbitration…as set forth in your email to me dated November 24, 2015…as such terms were clarified as set forth below pursuant to our telephone conversation on November 25, 2015." (*Id.*)

34. Giencourt's motion to enforce a settlement asserted that Giencourt's December 8th email was an acceptance of IMAX's offer to settle claims in the arbitration. Giencourt made this claim despite the fact that the parties had a ten year history of entering into lengthy written commercial agreements after initial discussions and email exchanges outlining a frame work for an agreement that were then subject to extensive negotiations between the parties. Indeed, acknowledging that the emails contained only an outline for a future agreement, Mr. Sfeir concluded his December 8 email with: "I look forward to our call today between 4:00 PM and 6:00 PM EST so that we may discuss the logistics of implementing those settlement terms."[9]

---

8 Cooperman Decl., Ex. E.

9 Cooperman Decl., Ex. E.

35. According to Giencourt, the brief, less than three page, email exchanges on November 24 and December 8, as augmented by a November 25 phone call that was never memorialized, resolved all issues in dispute relating to the 121-page 2013 Master Agreement and the approximately 30-page independent Theatre Agreements for the five terminated theaters. An informal agreement based on emails and a phone call was therefore well outside of the parties' ten year course of dealing.

36. That the three pages of emails were intended to be only a framework for a future potential agreement is demonstrated by the absence of key terms that needed to be negotiated. For example:

- Mr. Welton's November 24, 2015 email discussed returning the $3.45 million Giencourt paid for the three 2005 Agreement theatre systems that had never been sold to an exhibitor. There was no agreement on when that money would be paid; Mr. Weltons' view was that it would be paid only if the three theatres actually opened. Giencourt wanted payment immediately, which made sense to IMAX given Giencourt's 10-year default on its 2005 obligation to open theatres. (*Id.*)

- Mr. Welton's email spoke of paying commissions to Giencourt on the opening of theaters as part of a settlement, but there was no discussion, much less agreement, regarding which type of theatres would be subject to the commissions. (*Id.*)

**The Proceedings Regarding The Alleged Agreement**
**<u>Which the Tribunal Entertained Over IMAX's Objection</u>**

37. IMAX objected to the Tribunal's jurisdiction to entertain Giencourt's application to determine whether the e-mail exchange constituted a settlement agreement. Under Section 18.12 of the 2013 Master Agreement, the parties agreed to arbitrate "[a]ny dispute <u>under</u> this Agreement" (emphasis added). A dispute over whether the parties agreed to a separate settlement agreement was not within the scope of that clause. If Giencourt believed that an enforceable settlement agreement had been entered, that determination should have been made by a Court, and not the Tribunal.

38. Despite IMAX's objection, the Tribunal took written and oral testimony concerning whether there was a binding settlement agreement. In February 2016, Giencourt submitted a written opinion of Professor Stephen Smith of McGill University in support of its assertion that the two emails constituted a binding settlement. Despite the ten-year course of dealing of Giencourt and IMAX entering into complex and lengthy commercial contracts, Giencourt did not provide any of those commercial agreements to Professor Smith. His opinion was instead based solely on his review of the email exchange in late 2015.

39. IMAX then submitted an expert report on the law by the Honorable Stephen Goudge, Q.C., a former Associate Chief Justice of the Court of Appeal for Ontario (Ontario's highest court). Justice Goudge opined that, Giencourt's settlement application was not within the Tribunal's jurisdiction. Justice Goudge also opined that, based on the narrow arbitration clause in the 2013 Master Agreement, the two emails did not constitute a binding agreement under Ontario law because, among other things: (i) the correspondence demonstrates that Giencourt did not properly "accept" a live "offer"; (ii) and instead modified the purported offer; (iii) the context of the discussions strongly suggest that the parties did not agree on essential terms; and (iv) the ten-year history of dealings between the parties indicated that a formal, legal agreement – which would memorialize a global settlement – was intended by the parties, and they did not intend for email correspondence and a telephone call to constitute a binding settlement agreement.

40. On October 20, 2016, a hearing was held on Giencourt's application to enforce a settlement agreement. Mr. Sfeir and Mr. Welton both testified. Among other things, Mr. Sfeir testified that, at the time he was communicating with Mr. Welton regarding settlement, his

understanding was that the communications were only for the purpose of settlement.[10] Mr. Welton repeatedly testified that, throughout his discussions with Mr. Sfeir, he understood the parties to be laying groundwork for a potential global settlement that would resolve issues beyond what was discussed in the emails themselves.[11]

**The Tribunal's "Partial Final Award" Finding That**
**Two E-Mails Constituted An Enforceable Agreement**

41. On February 7, 2017, the Tribunal issued the Partial Final Award. The Tribunal started by enumerating Giencourt's claims for relief in the arbitration, which were limited to alleged breaches of the 2013 Master Agreement:

- Asking that IMAX be found to have breached the 2013 Master Agreement, including its duty of good, faith in performing the agreement;
- Asking that IMAX be required to pay Giencourt damages adequate to compensate for IMAX's breaches of the 2013 Master Agreement;
- Requiring that IMAX indemnify Giencourt against any liability to the exhibitors arising from its terminations of several individual theatre agreements in breach of its duty of good faith under the 2013 Master Agreement;

42. The Tribunal then noted that Giencourt's application to enforce a settlement based upon an e-mail exchange sought different relief (the "Settlement Claims") and that relief was separate from an alleged breach of the 2013 Master Agreement:

- Declaring that there is valid and enforceable settlement agreement between the parties based on the exchanged emails;
- Directing the Parties to perform the settlement agreement set forth in the emails; and
- Terminating the arbitration in accordance with Article 29(1) of the ICDR Rules;[12]

---

[10] Cooperman Decl., Ex. I, at 1322-29.

[11] Cooperman Declaration, Ex. I, at 1418, 1431, 1433.

[12] Cooperman Decl., Ex. B, Partial Final Award, ¶ 42.

43. The Partial Final Award stated that the Tribunal viewed Giencourt's application to enforce a settlement as a "threshold issue" that should be determined prior to the parties' claims on the merits.[13] The Tribunal then wrongly found that it had the authority to determine whether it had jurisdiction over the Settlement Claims, and went on to find that it did in fact have jurisdiction.

44. The Tribunal based its finding of jurisdiction solely on the fact that it had jurisdiction over the parties' original prayers for relief, as opposed to an independent basis for jurisdiction over the Settlement Claims. The Tribunal found that it had "authority to determine the destiny of the prayers for relief advanced by the Parties" and the Tribunal's "authority is to decide whether those prayers for relief are, to use an opposite expression, alive or dead." The Tribunal also decreed, without citing any legal authority, that, "[a]bsent special circumstances, the power to decide claims submitted to arbitration necessarily includes the power to decide if they have been settled."[14]

45. In fact, a Tribunal's power is limited to the delegation of authority under an agreement to arbitrate. At no time did IMAX and Giencourt agree to arbitrate the issue of whether they had reached a new settlement agreement. It was instead for a court to decide whether a separate settlement agreement had been reached.

46. Having wrongly determined that it had jurisdiction to determine Giencourt's Settlement Claims, the Tribunal went on to analyze the emails exchanged between the parties during settlement negotiations.

---

[13] Cooperman Decl., Ex. B, Partial Final Award, ¶ 47.

[14] Cooperman Decl., Ex. B, Partial Final Award, ¶¶ 60-63.

47. The Tribunal found that Mr. Welton's November 24 email contained an "offer" to settle the dispute, that Mr. Sfeir's December 5 email contained a "counteroffer" that "killed" the November 24 "offer", but Mr. Welton's December 7 email then "resurrect[ed]" the "offer" contained in the November 24 email, and that Mr. Sfeir "accepted" that "offer" – as "clarified" by telephone on November 25 – by sending IMAX a letter by email on December 8. The content of the November 25 telephone conversation was disputed by the parties, yet the Tribunal found as a "matter of fact" that certain items were clarified on that call.

48. The Tribunal found that just two out of seven emails – Mr. Welton's November 24th email and Mr. Sfeir's December 8th email – constituted an "offer" and "acceptance" forming a settlement agreement. The Tribunal ignored the content of the rest of the parties' communications.[15] The Tribunal further found that there were no "missing essential terms" even where "an exact date or deadlines" for payment was not articulated by the parties.[16]

49. Accordingly, the Tribunal granted the first of Giencourt's Settlement Claims: "*Declaring that there is a valid and enforceable settlement agreement between the parties.*"[17] The Tribunal also declared all of the substantive claims in the arbitration to be moot in light of this finding.

50. The Tribunal then held that it had the power to issue an Order enforcing the email settlement agreement, reasoning as follows:

> While the Arbitral Tribunal has declared that there is a valid and enforceable settlement agreement made between the Parties, the second relief as sought gives that finding teeth insofar as it directs specific performance. However, the Arbitral Tribunal has carefully

---

15 Cooperman Decl., Ex. B., Partial Final Award, ¶ 124.

16 Cooperman Decl., Ex. B., Partial Final Award, ¶ 124.

17 Cooperman Decl., Ex. B., Partial Final Award, ¶ 152.

> considered this submission as regards the consequence for the granting, now, of a final order for specific performance. If the Arbitral Tribunal grants, now, an order for specific performance this will mean that its jurisdiction over the arbitration is spent, save for questions of costs. This would mean, in a hypothetical future scenario, that if 1MAX was not subsequently to perform, there would be questions over who had authority to deal with enforcement.[18]

51. The Tribunal's understanding of the division of authority between itself and a court is mistaken. Courts – and not arbitral tribunals – are tasked with enforcing arbitration awards under applicable U.S. law. Nevertheless, the Tribunal, stated "the practical importance of an order for specific performance" and "decided to hold over Giencourt's prayer for relief seeking a direction that the Parties perform the settlement agreement" and "retain[ed] jurisdiction" over that claim.[19]

**The Final Award Declining Giencourt's Request to Supply Material Terms to the Alleged E-Mail Settlement and Awarding Attorneys' Fees**

52. As stated above, the parties' e-mail exchange contained a skeletal framework regarding a potential global settlement that would resolve issues under the 2013 Master Agreement and five independent theatre agreements. Mr. Sfeir's December 5 e-mail pointed out the uncertainties and deficiencies in the Welton's November 24, 2015 e-mail proposal. Three days later Mr. Sfeir embellished the November 24th e-mail with terms from a disputed phone conversation on November 25, 2015 and asked to schedule another phone call to "discuss the logistics of implementing these settlement terms."[20] This e-mail could not qualify as an

[18] Cooperman Decl., Ex. B., Partial Final Award, ¶ 154.

[19] Cooperman Decl., Ex. B., Partial Final Award, ¶ 155.

[20] Cooperman Decl., Ex. E.

unconditional acceptance and only underscores the indefinite nature of the Partial Final Award's finding of a settlement agreement.

53. Prior to issuing a Final Award, the Tribunal entertained Giencourt's application to supply additional and material terms to the e-mail settlement agreement. These terms included the following:

- The e-mail settlement stated that IMAX as part of a settlement would pay commissions "on 12 deals we have done directly with the client", without identifying any of those 12 deals. Giencourt sought to the Tribunal to include the identity of specific deals into the agreement, although that was matter of dispute.

- The settlement e-mails discussed paying Giencourt commissions of the terminated theaters, subject to the Ontario court lawsuits, would actually open. Giencourt sought a ruling that it was entitled to a commission for IMAX's opening of another theater, in Puerto Rico, separate from the Puerto Rico deal signed by Giencourt that had never opened and was terminated.

- Giencourt sought the Tribunal to order that the settlement e-mails had violated the Ontario court Judgment relating to the terminated independent three deals, although that was nowhere in the settlement e-mails.

- Giencourt sought to require IMAX to pay a commission on a new theatre deal involving IMAX® technology that was not subject to the 2013 Master Agreement.

- Giencourt sought an order requiring IMAX to immediately pay $3.45 million for the 2005 agreement theatres, even though the settlement e-mails were silent on the time of repayment and IMAX's position during those settlement negotiations was that repayment would not occur until those three theaters actually opened.

54. On July 21, 2017, the Tribunal issued its Final Award. As in the Partial Final Award, the Final Award contained a recitation of the parties' claims for relief on the merits. The Tribunal noted that the parties were in dispute about two issues: (i) the "substantive

consequences, if any, which the Arbitral Tribunal can order, of the valid and enforceable settlement agreement" between Giencourt and IMAX; and (ii) costs.[21]

55. The Tribunal described Giencourt's remaining Settlement Claims as asking the Tribunal for an award:

> *(i) identifying the provisions of the settlement agreement that the Tribunal has found the parties to have entered into,*
> *(ii) directing the parties to perform that agreement (i.e., declaring that the parties are required to abide by that agreement),*
> *(iii) awarding to Giencourt those amounts that by now have become due under the agreement*

56. The Tribunal stated that the "non-performance on the part of IMAX of the Settlement Agreement is at the heart of Giencourt's position and that Giencourt was seeking a declaration of"[22] "the rights, obligations, performance, breach, enforcement, and remedies which arise from the settlement agreement"[23] and the payment of "liquidated" amounts. The Tribunal agreed with IMAX that it did not have jurisdiction to determine such claims:

> [The Tribunal's] authority does not extend to the policing or enforcement of the Settlement Agreement. For example, the exact timing of when payments are due pursuant to the Settlement Agreement is not a matter for this Arbitral Tribunal. The proof of the existence of the Settlement Agreement is plainly something which can, in whatever other forum might be seised of disputes between the parties (if they continue to fight over how the Settlement Agreement is to be implemented), be established by reason of the outcome of this arbitration. Relitigating the existence of the Settlement Agreement is not, in the Arbitral Tribunal's assessment, something which ever needs to take place again. However, the parties did not include language in the Settlement

---

[21] Cooperman Decl., Ex. C., Final Award, ¶ 17.

[22] Cooperman Decl., Ex. C, Final Award, ¶ 19.

[23] Cooperman Decl., Ex. C, Final Award, ¶ 27.

> Agreement which placed authority in the hands of this Arbitral Tribunal to enforce its terms.[24]

57. While the Tribunal properly found that it did not have jurisdiction to enforce or order performance of a settlement agreement, the Tribunal's suggestion that another forum could determine the "exact timing of when payments are due" – when the settlement agreement is missing those terms – highlights the artificial jurisdiction the Tribunal created for itself to issue the Partial Final Award. On the one hand, the Tribunal claimed to have jurisdiction to declare "the existence of" the settlement agreement over IMAX's objection; on the other, the Tribunal declined jurisdiction to opine on the terms and obligations contained in the settlement agreement.

58. As in the Partial Final Award, the Tribunal cited no authority for its decision to draw the line where it did with regard to the scope of its jurisdiction. In fact, the power to arbitrate is solely based on the delegation of authority by the parties' contract. Nowhere in the alleged email settlement agreement, in the 2013 Master Agreement or elsewhere, did IMAX and Giencourt agree to arbitrate disputes over any aspect of the alleged email settlement.

59. Then, further complicating matters, the Tribunal found that it *did* have jurisdiction over Giencourt's request that it "identify" the provisions of the settlement agreement:

> Identifying the provisions in detail does not in any way direct performance, or engage in an interpretation of the Settlement Agreement. Rather, identification of the provisions of the Settlement Agreement in this Final Award does no more than add detail which was already contained within the finding of paragraph 125 of the Partial Final Award.[25]

60. The Tribunal then went on to set out "the terms of the agreement" and "enumerate [the] provisions" of the agreement in the *dispositif* of the Final Award. There, the Tribunal

---

[24] Cooperman Decl., Ex. C, Final Award, ¶ 30.

[25] Cooperman Decl., Ex. C, Final Award, ¶ 30.

pasted the entire contents of IMAX's November 24 email, Giencourt's December 7 email, and Giencourt's December 8 email. While the Tribunal purported to be merely "adding detail" to what was in paragraph 125 of the Partial Final Award, that is not what the Tribunal actually did. Paragraph 125 of the Partial Final Award describes the settlement agreement as follows:

> In that letter of December 8, 2015, Giencourt accepted the offer (revived by Mr. Welton on December 7, 2015) put by IMAX in the email sent by Mr. Welton on November 24, 2015, and clarified by telephone conversation between Mr. Sfeir and Mr. Welton on November 25, 2015. Those clarifications on the telephone were recorded in the letter of December 8, 2015.[26]

61. In other words, the Partial Final Award apparently found that the settlement agreement consisted of the November 24 and December 8 emails, plus a November 25th telephone conversation. The December 7 email merely functioned, according to the Tribunal, as a "revival" of the offer contained in the November 24 email. Yet, in the Final Award, the Tribunal included the entire contents of the December 7 email when it was enumerating the "provisions" of the settlement agreement.[27] Moreover, the November 25th phone call is not even mentioned as part of the agreement in the Final Award, despite being included in the Partial Final Award.

62. The Tribunal's confusion with regard to the actual terms of the settlement agreement is also evidenced by its insistence that there were no missing terms. Demonstrating the need for a global settlement agreement, IMAX pointed out several areas where the emails between the parties did not specify terms. For example, while the parties talked about different "buckets" of theatres, there was nothing to indicate which specific theatre deals fell in the

---

[26] Cooperman Decl., Ex. B, Partial Final Award, ¶ 125.

[27] Cooperman Decl., Ex. C, Final Award at 21.

"signed theatres" or "unsigned theatres" buckets. Nor did the parties specify when particular payments would be due or what conditions precedent were necessary before IMAX's obligations would arise.

63. Giencourt itself could not clearly set out which payment obligations it believed were triggered. In its first submission following the Partial Final Award, Giencourt also sought to fill in missing terms of the settlement agreement in its submission prior the Final Award. In response, IMAX methodically catalogued the problems with the specific amounts of money Giencourt claimed were "liquidated" under the settlement agreement. Giencourt never responded to that analysis.[28]

64. In the Final Award, the Tribunal confusingly characterized that exercise as IMAX "point[ing] out errors in Giencourt's calculations of sums due pursuant to the Settlement Agreement."[29] Yet this was not about a "calculation error"; it evidenced the fact that the purported settlement agreement is unenforceable and, as a practical matter, unworkable in several respects.

65. The Final Award also showed, again, that the Tribunal fundamentally misunderstood the division of power between itself and U.S. courts, and IMAX's options for challenging the Awards. The Tribunal reasoned that "the fact of the Settlement Agreement … is *res judicata* as between IMAX and Giencourt" because IMAX had not moved to vacate the Partial Final Award and that the "legal finality of the Partial Final Award unequivocally means, in the absence of any court application for *vacatur* (the time for which has apparently now expired under the Federal Arbitration Act and/or the Florida International Arbitration Statute),

---

28 Cooperman Decl., Exs. J, K.

29 Cooperman Decl., Ex. C, Final Award, ¶ 20.

the fact of the Settlement Agreement is established once and for all."[30] This is wrong in at least two respects.

66. First, it misunderstands the concept of *res judicata* – and it is not up to the Tribunal to decide what legal effect its Awards would have on later court proceedings. Second, merely using the word "Final" in the title of the "Partial Final Award" does not make it "final" for the purposes of a motion to vacate. The Tribunal left open Giencourt's claim for "an order directing performance of the settlement agreement" for "disposition by later or award or awards."[31] The Tribunal also found that this claim for performance would "give[]…teeth" to the finding that there was a settlement, and that deciding that claim in the Partial Final Award would "mean that its jurisdiction over the arbitration [was] spent".[32] Indeed, in briefing following the Partial Final Award, Giencourt took the position that it needed a Final Award in order to proceed to enforcement. Under these circumstances, the Tribunal's assertion that the Partial Final Award was ripe for a motion to vacate was incorrect.

67. The Tribunal's decision on costs in the Final Award is yet another area in which the Tribunal erred. Giencourt sought approximately $1.9 million in costs and attorneys' fees. The Tribunal granted Giencourt $971,525.38 in costs and fees in the Final Award.[33] The Tribunal relied upon the fact that the purported settlement happened before the merits hearing, which the Tribunal concluded was "legally, for naught" given its finding that there was a settlement.[34] This ignores the reality of Giencourt's settlement application, which Giencourt

---

30 Cooperman Decl., Ex. C, Final Award, ¶ 26.

31 Cooperman Decl., Ex. B, Partial Final Award, at 67.

32 Cooperman Decl., Ex. B, Partial Final Award, ¶ 154.

33 Cooperman Decl., Ex. C, Final Award, ¶ 46.

34 Cooperman Decl., Ex. C, Final Award, ¶ 38.

sprang on IMAX on December 10, two business days before the scheduled December 14 hearing. Because IMAX's counsel and witnesses needed to travel to Miami, IMAX's counsel emailed the Tribunal on December 10 as follows:

> I am sending this email in response to the email received by counsel for Giencourt earlier this afternoon. As Giencourt made this motion with no prior notice, and had never told IMAX that it intended to seek an adjournment of the hearing, we have not had the time to compile a fuller and more formal response. We are of course willing to do so. Alternatively, we suggest having an immediate call by tomorrow morning given that the arbitration is scheduled for Monday and many [of] us have travel plans.

68. On behalf of the Tribunal, Chairman Reichert wrote back to the parties later that day and stated, in part:

> The Tribunal has considered the position and has decided that we will discuss with you the Claimant's Motion on Monday morning at the start of the hearing. In light of the nature and extent of the matters raised, both by the Motion, and by the Respondent's position as set out below, a telephone call tomorrow is not preferred to having an in-person discussion on Monday. So that there is no doubt, by discussion, we do not mean hearing of the Motion.[35]

69. In other words, the Tribunal rejected IMAX's request for a call and instead required all counsel to travel to Miami notwithstanding Giencourt's eleventh-hour settlement motion. IMAX of course continued to prepare during that five-day period for all contingencies. After its extensive preparation and having incurred travel expenses, it was IMAX's view that the most efficient way to proceed on December 14 was to complete the merits hearing. On the first day of the hearing, the Tribunal noted that if Giencourt could show there was a settlement, an award of costs "*might* well follow."[36] In the Final Award, the Tribunal seized on this reference

---

[35] Cooperman Decl., Ex. G.

[36] Cooperman Decl., Ex. C, Final Award, ¶ 38.

as authority for the award of costs. Putting aside that the Tribunal merely said costs "might" follow, the Tribunal's responsibility is to determine whether reasonable costs should be awarded under the ICDR Rules; pre-judging the issue shirks that responsibility.

70. Article 31 of the 2009 ICDR rules permits the Tribunal to "apportion such costs among the parties if it determines that such apportionment is reasonable, taking into account the circumstances of the case." These costs may include "the reasonable costs for legal representation of a successful party." The Tribunal erred both in finding that Giencourt was entitled to costs, and in refusing to make Giencourt demonstrate that its costs were reasonable.

71. Giencourt sought to recover all of its fees and costs incurred after Mr. Sfeir's December 8 email, a total of nearly $1.9 million. IMAX showed that Giencourt was not entitled to this exorbitant amount for several reasons. First, there was no ruling on the merits of Giencourt's claims, or IMAX's counterclaim. In fact, the Tribunal took pains to explain that its finding of a settlement rendered all claims on the merits moot, meaning there was no "winner" to be awarded costs. Awarding fees thus exceeded the Tribunal's jurisdiction under ICDR Article 31, which only provides a Tribunal the authority to award legal fees to a "successful party".

72. Second, IMAX was not advancing a spurious position in opposition to the settlement motion. The claimed settlement agreement was based on a brief exchange of emails. IMAX's position that these emails did not as a matter of Ontario law constitute a binding agreement was supported by the testimony of Justice Goudge, an 18 year Ontario Court Judge and a former Associate Chief Justice of the Ontario Court of Appeal. Accordingly, IMAX had a good faith legal basis to oppose Giencourt's motion.

73. Third, aside from the fact that the Tribunal lacked jurisdiction to decide the issue of whether a series of e-mails constituted an enforceable contract, those e-mails did not authorize

the Tribunal to award attorneys' fees or costs in connection with a motion to enforce them as a settlement agreement. The emails that the Tribunal found constitute a settlement agreement do not provide for, or even mention, the issue of apportioning fees – which settling parties would normally address during negotiations so that any allocation of costs can be memorialized in the settlement. Otherwise, there would be no point to including a prevailing party attorneys' fee provision in a written agreement.

74. The Tribunal also awarded costs despite Giencourt's failure to show that its attorneys' fees and costs were "the *reasonable* costs for legal representation of a successful party" as required by Article 31 of the ICDR Rules (emphasis added). Giencourt gave the Tribunal no means whatsoever to measure whether the amounts of legal fees and costs that it claimed to have incurred were reasonable. Giencourt instead provided lump sums for fees and costs that it claims to have incurred over different time periods, without providing any information about which attorney(s) performed which type of task, the number of hours performed for such task and the hourly rate for such attorney. Since the ICDR Rules only gave the Tribunal jurisdiction to award reasonable costs, the Tribunal exceeded its jurisdiction by awarding fees and costs without any basis for determining whether they were reasonable.[37]

**AS AND FOR A**
**FIRST CLAIM FOR RELIEF**

**(To Vacate the Partial Final Award and the Final Award)**

[37] In fact, Giencourt's requested legal fees were facially unreasonable for a number of reasons. For example, Giencourt claimed to have incurred more than $700,000 in fees from March 1 to October 19, 2016, a period when Giencourt only reviewed IMAX's March 18, 2016 opposition papers, and prepared for a two day hearing that took place on October 20 to 21 and did not even last the full two days. Even assuming an excessive hourly rate of $900 that equates to approximately 780 hours of time, or 98 eight-hour days, spent to prepare for less than two full days of October hearings.

75. Petitioner repeats and realleges each allegation contained in Paragraphs 1 through 74 above as if fully set forth herein.

76. The Awards fall under the New York Convention, as implemented by the FAA, 9 U.S.C. §§ 201-208.

77. A true and correct copy of the 2013 Master Agreement, which contains an arbitration clause and which is an "agreement in writing" as defined by the New York Convention, is attached to the Cooperman Declaration as Exhibit A.

78. A true and correct copy of the Partial Final Award is attached to the Cooperman Declaration as Exhibit B.

79. A true and correct copy of the Final Award is attached to the Cooperman Declaration as Exhibit C.

80. The Partial Final Award and the Final Award should be vacated in their entirety under the New York Convention and the FAA because: (i) the Awards deal with "a difference not contemplated by or not falling within the terms of the submission to arbitration" and they contain "decisions on matters beyond the scope of the submission to arbitration" (New York Convention, Art. V(1)(c)); (ii) "recognition or enforcement of the [Awards] would be contrary to the public policy" of the United States (New York Convention, Art. V(2); (iii) the "arbitral procedure was not in accordance with the agreement of the parties" (New York Convention, Art. V(d)); and (iv) the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made" (9 U.S.C. § 10).

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner requests entry of an order and judgment:

(a) Vacating the Partial Final Award rendered on February 7, 2017;

(b) Vacating the Final Award rendered on July 21, 2017; and

(c) Awarding such other and further relief as this Court deems just, proper and equitable.

## REQUEST FOR HEARING PURSUANT TO LOCAL RULE 7.1(B)(2)

81. As the Court can see from this Petition and the accompanying Memorandum of Law, this matter is complex and involves an unusual procedural history. IMAX believes a hearing would therefore benefit the Court so that the relevant factual and procedural issues can be more fully and elaborately explained to the Court.

82. In addition, there are numerous provisions of the ICDR Rules, the New York Convention, and the FAA that are implicated in this Petition, which may further complicate a full appreciation of IMAX's arguments.

83. Moreover, IMAX is unaware of any legal precedent whereby an arbitration panel imposed a contested email settlement allegedly reached on the eve of arbitration involving the claims the arbitrators were empowered to resolve. Accordingly, IMAX anticipates that the Court may desire a more robust explanation concerning how existing legal precedent impacts the outcome of this Petition.

84. For all of the foregoing reasons, IMAX respectfully requests a hearing of two hours on this Petition, or such other amount of time as the Court deems appropriate.

Dated: October 17, 2017

Respectfully submitted,

**BERGER SINGERMAN LLP**
*Attorneys for Plaintiff*
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By: /s/ *Michael J. Higer*
Michael J. Higer
Florida Bar No. 500798
mhiger@bergersingerman.com
Matthew S. Nelles
Florida Bar No. 009245
mnelles@bergersingerman.com
DRT@bergersingerman.com

and

Jonathan K. Cooperman*
Melissa E. Byroade*
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Phone: (212) 808-7800
Facsimile: (212) 808-7897
*Application for admission *pro hac vice* forthcoming

*Attorneys for Petitioner IMAX Corporation*